UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                                              :
UNITED STATES OF AMERICA,                                     :
                                                              :
            v.                                                :    **MEMORANDUM AND ORDER**
                                                              :    21-CR-497 (WFK)
JOSHUA MARKOVICS,                                             :
                                                              :
                        Defendant.                            :
--------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On July 2, 2024, Joshua Markovics ("Defendant") pled guilty to one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. Plea Agreement ("Plea") ¶ 1, ECF No. 290. The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to thirty (30) months' incarceration; one (1) year of supervised release with both the standard and special conditions of supervision; restitution in the amount of $330,552.00, as set forth in the Plea; a fine of $10,000.00; and a $100.00 mandatory special assessment.

## I.    Background

### *Factual Background*

Defendant and others helped carry out a fraudulent scheme organized by co-defendant David Motovich ("Motovich"). Motovich operated Midwood Lumber, a family-run business which sold building materials and equipment to contractors operating in the New York City metropolitan area. Presentence Investigation Report (the "PSR") ¶ 4, ECF No. 390. Alongside the operation of his family business, Motovich ran an illegal, underground check-cashing business since at least 2012 (the "Midwood Check-Cashing Business). *Id.*

The Midwood Check-Cashing Business did not abide by applicable federal regulations governing check cashers.[1] Check cashers have disclosure obligations to prevent illegal activity

---

[1] By definition, "check cashers" are persons in the business of "accept[ing] checks . . . in return for currency or a combination of currency and other monetary instruments or other instruments, in any amount greater than $1,000[.00] for any person on any day in one or more transactions[.]" *Id.* ¶ 13.

(e.g., money laundering, sanctions evasion, and terrorism), such as registering with the U.S. Department of Treasury's Financial Crimes Enforcement Network (FinCEN) and filing Currency Transaction Reports for movements of currency greater than $10,000.00. *Id.* ¶¶ 13–14.

The Midwood Check-Cashing Business did not abide by these regulations. Customers of the Midwood Check Cashing Business—who were primarily owners and operators of construction-related businesses themselves—used Motovich's services to pay their employees in cash, avoid reporting wages to the Internal Revenue Service, and evade paying Federal Insurance Contribution Act (FICA) taxes. *Id.* ¶ 16. Motovich cashed millions of dollars through the check-cashing scheme, in exchange for a fee ranging between 4% and 15% on each transaction (as compared to the 2–3% fee typical of a licensed check-cashing business). *Id.* ¶ 17. Midwood Lumber was equipped with a secret room with safes which regularly contained hundreds of thousands of dollars in cash. *Id.* ¶ 16. Motovich did not report any of the illicit proceeds he made from the check-cashing business. *Id.* ¶ 19.

To conceal the illegal conduct, Motovich—with the help of others, such as Defendant— incorporated numerous shell companies which had no legitimate business purpose. *Id.* ¶¶ 18, 24–25. These entities were created solely to facilitate the illegal check-cashing scheme. *See id.* ¶ 19. The shell companies often copied the names of existing businesses, lending the shell companies an air of legitimacy. *Id.* In doing so, signatures for principals of these companies were forged, which placed small business owners at risk of both reputational and legal harm. *Id.* To further conceal the fraudulent shell companies, Motovich and those involved in the scheme provided fake invoices to make checks look like they were for legitimate services and issued fraudulent certificates of insurance. *Id.* ¶ 21. When victims of the scheme discovered their

signatures were being forged for illicit purposes and asked Motovich and his co-conspirators to stop, they continued to write fraudulent checks in their names. *Id.*

Defendant helped Motovich carry out this scheme primarily by opening a shell company under one of his employees' names, without the employee's knowledge or consent. As a principal for multiple construction companies in the New York City metropolitan area—such as Royal Home Builders and Royal Home Improvements—Defendant had various relationships with Midwood Lumber, the Midwood Check Cashing Business, and Motovich. *Id.* ¶ 7.

In April 2016, Defendant approached Reginald Garcia ("Garcia"), an employee of Royal Home Builders, and told him he needed to open a company to deposit Garcia's wages into a bank account. *Id.* ¶ 25. Defendant told Garcia he would provide him with a debit card linked to the account to withdraw his wages. *Id.*

Despite these representations, Defendant had no intention of depositing Garcia's wages into said account. *Id.* Instead, Defendant took Garcia to Coney Island Payroll Services ("CIPS"), a licensed commercial check-cashing business. *Id.* Motovich had loaned CIPS and its owners millions of dollars, which gave him effective control over the business. *Id.* ¶ 20. At CIPS, Garcia opened a check-cashing account for a company named "ZKC NYC." *Id.* ¶ 25. Defendant lied to Garcia to induce him to provide personally identifying information, which included his birth date, social security number, and driver's license. *Id.* ¶ 25.

After opening the CIPS account, Defendant and Motovich—using Garcia's information—went to Carver Bank to open a shell company bank account for ZKC NY (the "ZKC Account") without Garcia's involvement, knowledge, or permission. *Id.* Motovich had cultivated a relationship with Carver Bank's manager, Dannette Sullivan-Hyatt ("Sullivan-Hyatt"). *Id.*; Gov't Sent'g Mem. at 2, ECF No. 505. Motovich bribed Sullivan-Hyatt to permit him to open

3

bank accounts for various shell companies and to effectuate transactions in these accounts, even when he and his co-conspirators—like Defendant—were not named as signatories.  PSR ¶ 28. For example, after opening the ZKC Account, Sullivan-Hyatt permitted Defendant, Motovich, and Marina Kuyan ("Kuyan") to effectuate transactions through ZKC NY without Garcia's involvement or permission.  *Id.* ¶ 25.  Defendant's cell phone was purportedly listed as the contact for the account, so any inquiries related to the account would be directed to him rather than to Garcia or Motovich.  Gov't Sent'g Mem. at 2 n. 1.[2] Sullivan-Hyatt also notified Motovich about government subpoenas regarding investigations into Motovich.  PSR ¶ 28.

Millions of dollars passed through the ZKC Account.  Gov't Sent's Mem. at 2. Defendant, alone, issued checks totaling more than $280,000.00 from one of his companies to the ZKC Account.  PSR ¶ 26.  Moreover, over the course of his collaboration with Motovich, Defendant received money from various shell company bank accounts and obtained fraudulent certificates of insurance, allowing him to pay his employees "off-the-books."  *Id.*

*Procedural History*

On September 22, 2021, a U.S. Grand Jury returned an eighteen-count indictment (the "Indictment") against Defendant, Motovich, Kuyan, and Kemal Sarkinovic ("Sarkinovic", together with Defendant, Motovich, and Kuyan, "Defendants").  *See generally* Indictment, ECF No. 19.  Count Three alleged Defendant engaged in Bank Fraud in violation of 18 U.S.C § 1344; Count Seven alleged Defendant engaged in Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349; and Count Sixteen alleged Defendant engaged in Aggravated Identity Theft in

---

[2] Defendant contests his involvement in opening the account, noting "the ZKC bank account was opened by others" but he "took no action to close the account or alert his employee of its existence." Second Addendum to PSR ("2d Add. to PSR") at 2, ECF No. 494.

violation of 18 U.S.C. §§ 1028A(a)(1), (b) and (c)(5).  *Id.* ¶¶ 30–33, 38–39.  The Indictment also raised criminal forfeiture allegations as to Counts Three and Seven.  *Id.* ¶¶ 49–50.

On September 24, 2021, U.S. Department of Justice (the "DOJ") agents arrested Defendant.  PSR ¶ 34.  The same day, Defendant was arraigned before Magistrate Judge Robert M. Levy and pled not guilty to all counts.  ECF No. 31.  Defendant's bail was set at $3.25 million and he was released.  *Id.*

On July 2, 2024, six days before trial was scheduled to commence, Defendant pled guilty to Count Seven of the Indictment, charging him with Conspiracy to Commit Bank Fraud from January 2012 to February 2019.  Plea ¶ 1; *see also* Indictment ¶¶ 32–33.  Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of thirty-seven (37) months' incarceration or below.  Plea ¶ 4.  The Government agreed "no further criminal charges [would] be brought against [Defendant] for (1) bank fraud in or about and between 2015 and 2018, as alleged in Count Three of the Indictment; (2) conspiracy to commit bank fraud in or about and between 2012 and 2019, as alleged in Count Seven of the Indictment, and (3) aggravated identity theft in or about and between April 2016 and December 2017, as alleged in Count Sixteen of the Indictment."  *Id.* ¶ 5(a).  Furthermore, "no criminal charges [would] be brought against [Defendant] by the Office or the [DOJ], Tax Division, for his failure to collect and pay over FICA payroll taxes and/or income taxes, between the years 2015 and 2019[.]"  *Id.*

On March 3, 2022, Sarkinovic pled guilty to Count Seven of the Indictment.  ECF No. 74.  There is no sentencing hearing scheduled for Sarkinovic at this time.

On May 17, 2024, Kuyan pled guilty to Count Three of the Indictment.  Kuyan Plea Agreement ¶ 1, ECF No. 240.  Kuyan is scheduled to be sentenced on May 29, 2026. Scheduling Order, ECF No. 508.

Motovich proceeded to trial on July 8, 2024.  On July 30, 2024, Motovich was found guilty on sixteen of the eighteen counts charged in the Indictment.  ECF No. 349.  On November 24, 2025, he was sentenced to one hundred and eighty (180) months' incarceration to be followed by two (2) years of supervised release with both the standard and special conditions of supervision. Motovich Sent'g Mem. and Order at 1, ECF No. 451.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553.  Together with 18 U.S.C. § 3553, the U.S. Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form."  *Id.*  The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the

6

defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).  The Court now addresses each factor in turn.

III.    Analysis

A.  **The Nature and Circumstances of the Offense and the History and Characteristic of the Defendant**

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

i.  *Family and Personal History*

Defendant was born on January 29, 1976, in Brooklyn, New York, to the marital union of Benjamin and Golda Markovics.  *Id.* ¶ 61.  Defendant reports growing up in a household where both his parents were involved in his upbringing and "he and his siblings had all their needs met."  *Id.* ¶ 63.  As the eldest child, Defendant helped his parents around the household and cared for his younger siblings.  *Id.*  Defendant's childhood was free from abuse of any kind.  *Id.*

Defendant's father and mother are seventy-five and seventy-two years of age, respectively.  *Id.* ¶ 61.  Defendant's father is in fair health, given he has been in remission from prostate cancer for approximately seventeen or eighteen years.  *Id.*  Defendant's mother has also been in remission from cancer—specifically ovarian cancer—for approximately sixteen years. *Id.*  Defendant shares a good relationship with his parents, who are aware of the instant case and remain supportive of him.  *Id.* ¶ 61.

Defendant has two siblings, Menachem and Channie. *Id.* ¶ 62. Menachem is forty-five years of age and resides in Brooklyn, New York. *Id.* He is married with six children and works as a general contractor and developer. *Id.* Channie is forty-two years of age and resides in Lakewood, New Jersey. *Id.* She is married with four children and runs a start-up company. *Id.* Defendant reports a good relationship with his siblings, who are aware of his case and remain supportive. *Id.*

Defendant married his wife, Ethel, on April 21, 1997. *Id.* ¶ 64. Ethel is forty-six years of age and in good health. *Id.* She previously worked as a pharmacist but stopped working after their third child was born. *Id.* She also temporarily worked as a math teacher from 2024 until fall of 2025. *Id.* Defendant has a great relationship with his wife, who has expressed her support for her husband and the difficulties her family has faced since this case began. *Id.*; *see* Def's Sent'g Mem., Ex. A, Tab 55 (letter from E. Markovics). According to Ethel, Defendant is the "backbone" of both their family and the community as a whole. PSR ¶ 65.

Defendant and his wife have seven children: Hinda, age twenty-five; Mattie, age twenty-four; Shloime, age twenty-one; David, age eighteen; Chava, age sixteen; Blima, age thirteen; and Aron, age eight. *Id.* ¶ 66. Defendant reports a close and "excellent" relationship with his children. *Id.* All but the youngest are aware of the instant case and remain supportive of him. *Id.*[3]

Defendant has received nearly one hundred letters of support from family, friends, employees, colleagues and members of his community. Def.'s Sent'g Mem., Ex. A; *see also* Def.'s Sen'tg Mem., Ex. B. These letters recount numerous examples of Defendant's charitable

---

[3] While the statement refers to his children more generally, according to the PSR only his youngest child is not aware of this case. *See* PSR ¶ 66.

contributions—financial and otherwise—to those around him.  *See id.*  The Court has considered the sentiments expressed in each of the letters submitted by defense counsel.

### ii.   *Educational and Employment History*

From the age of thirteen until the age of eighteen, Defendant attended Ner Israel Rabbinical College in Baltimore, Maryland.  *Id.* ¶ 73.  Defendant went on to attend Brooklyn College but transferred his credits to Long Island University ("LIU") in 1996.  *Id.*  In 2000, Defendant received both a bachelor's degree in science and a master's degree in physical therapy from LIU.  *Id.*

Defendant is a physical therapist licensed to practice in New York.  *Id.* ¶ 74.  He worked as a physical therapist for the geriatric population in Brooklyn from 2000 until 2006, when he stepped away from his practice to work for his father's construction company, Royal Home Improvements.  *Id*. ¶¶ 74–76.  Defendant currently serves as the Vice President of Royal Home Improvements and earns $9,600.00 in gross profits per month.  *Id.* ¶ 75.  He also maintains 50% ownership in the company.  *Id.*

Defendant has significant financial assets amounting to over $7.2 million as of May 30, 2025.  *Id.* ¶¶ 78–82.  Therefore, Defendant appears able to pay a fine.  *Id.* ¶ 82.

### iii.   *Prior Convictions*

Defendant has no prior juvenile adjudications, adult criminal convictions, or arrests.  *Id.* ¶¶ 54–59.

### iv.   *Physical and Mental Health*

Defendant is currently in good physical health and reports no major ongoing physical concerns.  *Id.* ¶ 69.

Since the start of the instant case, Defendant has experienced a significant decline in mental health.  *Id.* ¶ 70.  Defendant began treatment with a psychiatrist in 2022 and now takes

anti-depressant medications. *Id.* ¶ 71. His condition has improved since he started treatment. *Id.*

### v. Substance Abuse

Defendant reports no history of drug or alcohol abuse. *Id.* ¶ 72. He noted consumption of alcohol socially and for religious holidays. *Id.*

### vi. Nature and Circumstances of the Offense

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

## B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendant aided a sophisticated, coordinated scheme to transact large quantities of money through fraudulent bank accounts and shell companies. *See* PSR ¶¶ 25–27. The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

## C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant.  18 U.S.C. § 3553(a)(3).  Defendant pled guilty to one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349.  Plea ¶ 1.

Defendant faces a maximum term of thirty years' incarceration and no minimum term. 18 U.S.C. § 1344.  Defendant also faces a maximum term of five years of supervised release.  18 U.S.C. § 3583(b).  If a condition of release is violated, Defendant may be sentenced to up to three years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision.  18 U.S.C. § 3583(e).  Defendant is ineligible for a term of probation.  18 U.S.C. § 3561(a)(1).

### D. The Kinds of Sentence and Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to consider "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines."  18 U.S.C. § 3553(a)(4)(A).

All parties agree the applicable Guidelines provision is U.S.S.G. § 2X1.1, which directs the Court to apply the "base offense level . . . for the substantive offense."  U.S.S.G.  § 2X1.1. Here, the Base Offense Level for the substantive offense—bank fraud—is found in U.S.S.G. § 2B1.1(a)(1).  PSR ¶ 42; Gov't Sent'g Mem. at 4; Plea ¶ 2; *see also* Def.'s Sent'g Mem. at 55, ECF No. 495 (referencing similarly situated defendants "sentenced under U.S.S.G. § 2B1.1"). U.S.S.G. § 2B1.1(a)(1) provides a Base Offense Level of 7 when defendant was "A) . . . convicted of an offense referenced to this guideline; and B) that offense of conviction has a statutory maximum of 20 years or more[.]"  Because the statutory maximum for bank fraud, 18 U.S.C. § 1344, is thirty years, a base level of 7 applies.  *See* Plea ¶ 1; PSR ¶ 42.

The parties agree certain enhancements and mitigating factors should apply.

11

First, the parties appear to agree U.S.S.G. § 2B1.1(b)(1)(G) adds 12 levels because the total loss stemming from the offense was greater than $250,000.00, but less than $550,000.00. U.S.S.G. § 2B1.1(b)(1)(G); *see* PSR ¶ 43; Gov't Sent'g Mem. at 4; Plea ¶ 2; Def.'s Sent'g Mem. at 42.

Second, the Government and the U.S. Probation Office ("Probation") note a two-level enhancement should apply pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) because Defendant engaged in the unauthorized use of any means of identification to unlawfully produce or obtain another means of identification.  PSR ¶ 45; Gov't Sent'g Mem. at 4.  Defendant's sentencing memorandum did not provide a Guidelines calculation, but incorporated the enhancements and reductions set forth in the Plea, such as U.S.S.G. § 2B1.1(b)(11)(C)(i).  *See* Def.'s Sent'g Mem. at 42 ("After applying the other enhancements and reductions set out in [the Plea], this results in a total offense level of 19."); Plea ¶ 2.

Third, the parties agree a two-level enhancement should apply pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means.  PSR ¶ 44; Gov't Sent'g Mem. at 4; Plea ¶ 2.

Fourth, the parties agree a two-level reduction should apply because Defendant is a Zero-Point Offender pursuant to the criteria set forth in U.S.S.G. §§ 4C1.1(a) and (b).  PSR ¶ 52; Gov't Sent'g Mem. at 4; Plea ¶ 2.

Finally, the parties agree a two-level reduction should apply due to Defendant's acceptance of responsibility under U.S.S.G. § 3E1.1(a).  PSR ¶ 50; Gov't Sent'g Mem. at 4; Plea ¶ 2.[4]

---

[4] Because Defendant pled guilty less than a week before trial, "which required the Government to prepare for trial, including preparing in limine motions and proposed jury instructions[,]" "[t]he Government advised that it does not intend to make a motion for the additional one level reduction under USSG §§ 3E1.1(b)."  PSR ¶ 51; *see also* Gov't Sent'g Mem. at 4 (applying only a reduction pursuant to § 3E1.1(a)).

All parties agree the Total Adjusted Offense Level for Defendant is 19.  PSR ¶ 53; Def.'s Sent'g Mem. at 42; Gov't Sent'g Mem. at 4. The parties also agree Defendant's Criminal History Category is I.  *See* U.S.S.G. § 4A1.1; PSR ¶ 56; Def.'s Sent'g Mem. at 55; Gov't Sent'g Mem. at 4.  A Total Adjusted Offense Level of 19 with a Criminal History Category of I results in a Guidelines range of thirty (30) to thirty-seven (37) months' incarceration.  U.S.S.G. § 5A.

This Court appreciates the sentencing arguments raised by all parties and seriously considered each in turn.

### E.  Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission."  18 U.S.C. § 3553(a)(5).

Defendant does not direct the Court to any additional policy statements made by the Sentencing Commission.  With respect to protecting the public from further crimes, however, Defendant cites to a 2004 report published by the U.S. Sentencing Commission which "found recidivism rates drop significantly after age 40."  Def.'s Sent'g Mem. at 52 (citing United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at p. 28 (2004), http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal _History.pdf).

The Court reviewed and carefully considered Defendant's argument.

### F.  The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

13

Defendant argues "[a] noncustodial sentence with a period of home confinement would not result in an unwarranted sentencing disparity between similarly-situated defendants" who are convicted of bank fraud or conspiracy to commit bank fraud. Def.'s Sent'g Mem. at 55. Furthermore, according to Defendant, "the U.S. Sentencing Commission's Judiciary Sentencing Information database [shows], over the last five fiscal years, 51% of non-cooperator defendants sentenced under U.S.S.G. § 2B1.1, with an offense level of 19 and a criminal history category of I, received downward variances without government motions." *Id.* (citing Judiciary Sent'g Database found at https://jsin.ussc.gov/analytics/saw.dll?Dashboard).

The Court has reviewed and considered carefully Defendant's arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Pursuant to the Plea, Defendant agreed to a Restitution Order in the amount of $330,552.00, consistent with 18 U.S.C. §§ 3663A and 3664. Plea ¶ 1(e). This amount—which is to be submitted to the Internal Revenue Service—reflects "tax loss caused by [Defendant] for the calendar years 2015 and 2019[,]" *Id.*

On April 22, 2026, this Court granted the Government's request to accept this payment prior to sentencing.

### IV. Conclusion

For the reasons set forth above, the Court sentences Defendant to thirty (30) months' incarceration; one (1) year of supervised release with both the standard and special conditions of supervision; a fine in the amount of $10,000.00 to be paid at a rate of $25.00 per quarter while in

14

custody and taken from 10% of his gross monthly income while on supervised release; restitution in the amount of $330,552.00, as set forth in the Plea; and a $100.00 mandatory special assessment.  This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the PSR and Addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion.  The Court advises the Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated:  April 27, 2026
        Brooklyn, New York